# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————————

**No. 201700003**

———————————————

**UNITED STATES OF AMERICA**
Appellee

v.

**EDWARD K. BROWN, JR.**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Major M.D. Sameit, USMC.
Convening Authority: 3d Marine Aircraft Wing, Marine Corps Air Station Miramar, CA.
Staff Judge Advocate's Recommendation: Major J.A. Cacioppo, USMC.
For Appellant: Lieutenant Jacob E. Meusch, JAGC, USN.
For Appellee: Captain Brian L. Farrell, USMC; Major Kelli A. O'Neil, USMC.

———————————————

Decided 2 July 2018

———————————————

Before MARKS, JONES, and WOODARD, *Appellate Military Judges*

———————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————————

MARKS, Senior Judge:

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of a single specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920

(2012).[1] The military judge awarded 30 months' confinement and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the punitive discharge, ordered it executed.

The appellant asserts two assignments of error. First, the government failed to prove beyond a reasonable doubt that the victim did not consent to sexual intercourse or disprove the mistake of fact defense beyond a reasonable doubt. Thus the conviction is factually insufficient. Second, trial defense counsel were ineffective for failing to challenge the admissibility of the appellant's statements and meaningfully cross-examine multiple key witnesses.

We find the appellant's conviction for sexual assault factually insufficient in light of evidence of a mistake of fact and set aside the findings and sentence, and dismiss the sole charge and specification.

## I. BACKGROUND

This case involves the single act of sexual intercourse that occurred in a brief relationship between a Marine and a college student. The relationship began in July 2015 when the appellant reached out to the college student, JW, via social media. They had a common friend in JW's ex-boyfriend, who had been a member of the appellant's unit. JW and the appellant exchanged messages and talked on a video chat application before meeting in person in late August 2015.

### A. JW's testimony

The night of Monday, 31 August 2015, the appellant visited JW at her apartment for the first time. The previous night, JW had gone to an urgent care clinic after suffering a nose bleed. She had been diagnosed with pharyngitis—a red and inflamed sore throat—and been directed to take ibuprofen, acetaminophen, and an antibiotic commonly known as a Z-pack. Around 8:00 p.m. on Monday night, JW and the appellant agreed that he would come to her apartment that night, and she gave him her address. JW testified that it was the appellant's idea to visit and that she told him she did not want him to come over: "I was weak and tired and just sick and I had a lot of homework to do. . . . I didn't see a point to it."[2] When asked on cross-examination to quantify how sick she felt on a scale of one to ten, with ten "being gravely ill," JW described herself as a "7."[3] She testified that she gave

---

[1] The military judge found the appellant not guilty of larceny of Basic Allowance for Housing, a violation of Article 121, UCMJ.

[2] Record at 60.

[3] *Id.* at 91.

the appellant her address because "[h]e wouldn't stop asking me and he had offered to set up the chair I had bought for my desk. So I figured the only way to get him to stop asking is to just let him over."[4] The appellant arrived around 9:30 p.m. Monday night. They stayed in the living room for about two hours while the appellant attempted to assemble JW's desk chair and JW did homework. JW's roommate came home around 11:30 p.m., greeted the appellant, and went to bed in her bedroom.

Shortly thereafter, JW "invited" the appellant into her bedroom to watch a television show on Netflix on her laptop computer.[5] She testified that she expected the appellant to go home after the show was over, and then she would go to sleep. JW shut her bedroom door behind them and went into her bathroom. She removed her clothes and her bra and changed into a "big t-shirt and mesh shorts" she normally "would wear to bed."[6] JW emerged from the bathroom, turned out the lights in her bedroom, and she and the appellant lay on her bed watching the laptop which was open on her lap.

JW described what happened next as three separate incidents. First, the appellant kissed her. The kiss came about 20 minutes into the television episode. Based on JW's narrative, it probably happened between midnight and 12:30 a.m. She testified that the appellant was on top of her "a few minutes," but the kiss did not "necessarily" last that long.[7] According to JW, she told the appellant, "No. Stop. I don't want this to happen. This is not happening tonight."[8] The appellant stopped, and they returned to the show.

At some point, the laptop fell to the floor. She did not attempt to retrieve the laptop but closed it.

"Just a few minutes" later, the appellant kissed JW again. This was the second kiss. The appellant rolled on top of her. It is unclear from JW's testimony whether she pushed the appellant off of her or he rolled off of her following the second kiss.

After this second incident, JW described a period of about an hour during which she and the appellant lay "fairly silent with little conversation." JW testified she "was staring at the ceiling."[9] Although JW estimated about an

---

[4] *Id.* at 60.

[5] *Id.* at 98-99.

[6] *Id.* at 63.

[7] *Id.* at 100.

[8] *Id.* at 64.

[9] *Id.* at 65.

hour passed, her subsequent testimony revealed it was likely closer to two hours. On cross-examination, JW testified that the appellant made multiple attempts to kiss her, but there was no "other romantic activity going on during that time period."[10]

Then, at exactly 2:36 a.m., the appellant rolled on top of JW a third time. JW was certain about the time because she reached for her iPhone on the desk beside her bed and pressed the home button to display the clock. She described the appellant holding her wrists above her head while kissing and biting her neck and trying to pull down her shorts and underwear. JW said she was able to grab her underwear and pull them back up. She testified that she verbally protested, saying no "30 to 40 times,"[11] and she specifically declined his proposals that they perform oral sex on each other. After he succeeded in a second attempt to remove her underwear, he tried to digitally penetrate her. But she swatted him away with her hands. She described trying to push him off of her with her hands and legs and testified that he "forcefully" pushed open her legs and penetrated her with his penis.[12] It is unclear when, but at some point JW said she gave up and went limp. She testified that she "froze" and "went into survival mode."[13] The appellant eventually ejaculated on JW's t-shirt. She went to the bathroom, threw her clothes in the dirty laundry, put on clean clothes, and returned to bed with the appellant. She testified she did not ask him to leave because she was afraid and believed there would be "some sort of repercussion from him."[14]

JW awoke the next morning, Tuesday, and prepared to go to school. She testified that she told the appellant she was angry with him and had not wanted to have sex with him. According to her testimony, he replied, "it was okay. That [she was] not a slut for sleeping with someone on the first night."[15] Nevertheless, JW and the appellant proceeded with plans that he would return to her apartment after her classes that afternoon. JW explained that she did not know what to say to dissuade him from returning. Instead she asked him to bring her food from a specific restaurant. So that afternoon, JW and the appellant met at her apartment, and she drove him back to campus with her so he could use the gym while she worked until 10:00 p.m.

---

[10] *Id.* at 100-01.

[11] *Id.* at 68.

[12] *Id.* at 69.

[13] *Id.* at 129.

[14] *Id.* at 70.

[15] *Id.*

Afterward they met at her car then stopped at a fast food restaurant and grocery store on the way back to her apartment where he spent the night a second time. JW testified that she rebuffed his kisses on Tuesday night, and they did not have sex again. The appellant returned to the apartment a third time Wednesday afternoon. They talked about their plans to go out that Sunday. Her roommate observed the conversation, later testifiying that "it seemed to me like she was trying to get around" their plans.[16] The appellant did not stay that night, departing around 7:00 p.m. after JW "very blunt[ly]" told him he needed to leave.[17]

They continued to text on Thursday and Friday about "random things."[18] JW believed it was Thursday when the appellant cancelled their weekend plans, citing the arrival of a female friend in town for the weekend. She testified that she "literally jumped up and down" when the appellant cancelled their plans.[19] Her roommate testified that when JW told her about cancellation of the plans JW "had a big smile on her face and kind of did a little jump of excitement."[20]

On Friday, JW met a girlfriend who asked her how things were going with the appellant. JW "just burst out into tears and told her [friend] everything that happened."[21] JW later confided in her roommate as well. The record contains none of the content of those conversations. JW texted her ex-boyfriend about the incident as well. Trial defense counsel called the ex-boyfriend to testify that JW told him about waking up to the appellant kissing and touching her.

After opening up to her friend on Friday afternoon, JW blocked the appellant from contacting her through any of her social media accounts. She ignored his text messages and refused to take his calls. The appellant contacted JW's roommate who replied via text message that JW was upset with the appellant. Almost two weeks later, JW contacted the San Diego Police Department to report that the appellant had raped her. Neither her report nor her interview was entered into evidence. A San Diego detective arranged for JW to initiate a pretext phone call with the appellant that resulted in a 26-minute recorded conversation.

---

[16] *Id*. at 143.

[17] *Id*. at 74.

[18] *Id*.

[19] *Id*. at 75.

[20] *Id*. at 144.

[21] *Id*. at 75.

## B. The recorded pretext phone conversation between JW and the appellant

In the company of the San Diego detective, JW placed the call to the appellant. During the first few minutes of the intercepted phone call between JW and the appellant, the appellant recounted his failed attempts to reach her, his message to her roommate, and the roommate's response. He understood from JW's roommate that JW was upset, and he understood it to stem, at least partly, from the hickey he gave her. It was clear that he believed his relationship with JW had been evolving normally until she suddenly cut contact, and he claimed to have "no idea"[22] why JW was suddenly so upset with him.

JW confronted the appellant with details of the evening. She said, "I just want to talk about this so we can move on from this."[23] JW began with her objection to his first kiss, an objection he "barely" remembered.[24] She said, "I know I said no like 20 or 30 times."[25] She asked him why he had come to her apartment that Monday night when he knew she was "super sick," and he replied without hesitation, "because you wanted me to."[26] The appellant agreed that JW did not say they were going to have sex that night. He acknowledged how they stopped after she protested the first kiss and returned to watching Netflix. He did not disagree that he turned over on top of JW and kissed her a second time. JW reminded him how she expressed pain when he kissed her neck and concern that he would leave a mark. The appellant acknowledged this and responded that he stopped sucking on her neck.

The appellant's recollection of events implied that physical activity between the two stopped and started repeatedly. He pointed to what he perceived as consent from her:

> [I] wanna say two or three times we stopped where we didn't do anything. There were times where you would touch me to feel on me, and I was just like[27]
> . . .

---

[22] Prosecution Exhibit (PE) 6 at 3:30.

[23] *Id.* at 4:30.

[24] *Id.* at 4:45.

[25] *Id.* at 5:00.

[26] *Id.* at 5:30.

[27] *Id.* at 7:15.

> There was a time where I was like stop and you just kept letting me go, and eventually we ended up having sex.[28]
>
> . . . .
>
> No, I'm not saying you let me just go and have sex. . . . When we were laying there you would let me keep doing what I'm doing. I remember there were a few times when you touched me like you wanted me to keep going.[29]

JW repeatedly redirected the conversation to when she said no. When she claimed that she said no while they were having sex, he insisted, "[w]hen we were actually having sex, you never said no."[30] She confronted him about pulling down her shorts and underwear. He claimed she was not wearing shorts, only the big t-shirt. JW testified that she threw away her clothing, so the government presented none of it as evidence.

When the appellant questioned the reason for their discussion, she said, "I want to move on. Like I want us to be okay."[31] With incredulity in his voice, he said:

> No, you're literally acting like I raped you. . . . If it was that you would've thrown a huge fit, and I wouldn't have been there for like two days afterwards. . . . And there's very few times in there where you actually said no and you were like, almost like, get the hell out of my apartment. You would say no and then keep kissing me. Or you would say no, it would be fine. Or you'd say no, and you would touch me. Or I would touch you.[32]

He repeated that he stayed at her apartment until Wednesday, and "it was never an issue. Only time it was an issue is when I said I was going to take you out or whatever, and I couldn't take you out because my friend was coming to town, and that was it."[33] JW remained silent, interrupting him only to refocus the conversation on his admission that she said no. Again she

---

[28] *Id.* at 7:30.

[29] *Id.* at 8:00.

[30] *Id.* at 8:45.

[31] *Id.* at 9:20.

[32] *Id.* at 9:45.

[33] *Id.* at 10:00.

explained she just wanted the truth, and "I don't want to have any animosity between us."[34]

At this point the appellant began to admit, with a placating tone, that JW said no. But "no" became disassociated from any particular act, and it was unclear whether this was no to a hickey, no to oral sex, or no to some other sexual act. The appellant continued to adamantly and explicitly deny that the sex was nonconsensual. JW asked if he held her arms down, and he replied with some exasperation, "Did I? I don't know?"[35]

Again she confronted him about her saying, no. He replied, "I remember you saying no, because you sat there and you did the little, frickin' whatever on my lips."[36] She countered, "the what?"[37] He explained, "you put your finger inside my lips."[38]

Both JW and the appellant grew audibly frustrated with each other as their conversation reached an impasse. JW repeatedly pleaded for the appellant to admit the truth. "There will be no moving on for us if you can't just admit to me the truth."[39] The appellant insisted that he had told her the truth. He offered an admission without remorse, in a tone that did not sound genuine. "It wasn't okay with you, and yes, you did say no. . . . Having sex with you wasn't okay. . . . Sorry, [JW], like what do you want me to say?"[40] She replied with emotion in her voice, "thank you. That's really what I wanted to hear."[41] But she pressed on. When she asked him if he forced himself on her or held her down, he vehemently responded, "No!"[42] He distinguished their encounter from rape by saying:

> Why you said no, and I just kept going? Because you would provoke me, first of all. Second of all, there was never a time where you. . . . You didn't forcibly say it, like you weren't killing me, you didn't choke me, you didn't freakin' slap me, you

---

[34] *Id.* at 10:45.

[35] *Id.* at 12:05.

[36] *Id.* at 12:20.

[37] *Id.* at 12:27.

[38] *Id.* at 12:30.

[39] *Id.* at 13:50.

[40] *Id.* at 14:20.

[41] *Id.* at 14:40.

[42] *Id.* at 13:25, 14:50.

didn't do anything. You almost said it as if you wanted me to keep going, but you weren't sure if you wanted to do it.[43]

She asked if he were sorry, and he gave, by its tone, a half-hearted apology that he had done something to offend her and this had come between their friendship. As they continued to argue about whether their encounter constituted rape, it was clear that they disagreed about whether the circumstances and the context in which no was uttered mattered. The appellant attempted to explain that rape would involve force or alcohol. JW countered that the pain relievers and antibiotic she was taking were comparable to alcohol. The appellant disagreed.

JW returned to confronting the appellant with his admission that she said no. He responded, "I don't want to keep reliving this. . . . What do you want me to say?"[44] Then he tried complimenting her, said he would love to continue talking to her, and offered a more sincere apology, insisting he had not intended whatever happened. In response, she said "If you want to move forward from this, then let's just admit the truth."[45] She asked how she could trust him without him acknowledging that she said no and he forced himself on her. He responded, "because that is not what happened."[46] He asked why she kept repeating herself, and she replied, "because you keep going back on what you're saying. I don't feel like you understand why I'm upset."[47] He tried again, attempting to explain that he had not come to her apartment that night to take advantage of her for sex. She interrupted him and solicited a somewhat vague admission that he did not mean to do it but did. Then she asked, "do you think you just went too far?"[48] He replied, almost in a whisper, "no. Why are you asking these questions?" The conversation returned to her desire for the truth and his insistence that he had told her the truth. She said, "You're not telling me the truth because you keep going back on your word. I just want to know that I can trust you."[49] The appellant responded, "you're never going to trust me."[50] She said she just wanted to know that this wasn't going to happen to someone else or to her again. In a measured tone

---

[43] *Id.* at 16:00.

[44] *Id.* at 20:45.

[45] *Id.* at 22:40.

[46] *Id.* at 23:00.

[47] *Id.* at 23:15.

[48] *Id.* at 24:40.

[49] *Id.* at 25:00.

[50] Id. at 25:05.

that lacked sincerity, the appellant said, "yes, you said no. Yes, I forced myself. If that's how you . . ."[51] JW interrupted him before he could finish, thanked him, and abruptly ended the phone call.

## II. DISCUSSION

The appellant avers that his conviction for sexual assault is legally and factually insufficient because he harbored a reasonable mistake of fact as to JW's consent to engage in sexual intercourse. We agree.

### A. Applicable law

#### 1. Legal and factual sufficiency

We review the legal and factual sufficiency of evidence *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). A conviction is legally sufficient if, "considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In resolving questions of legal sufficiency, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

"For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [appellate court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. "By 'reasonable doubt' is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt." *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

---

[51] *Id.* at 25:30.

*2. Sexual assault, bodily harm, and consent*

The appellant was charged with and convicted of sexual assault in violation of Article 120(b)(1)(B), UCMJ, which was comprised of these elements:

(1) That the accused committed a sexual act upon JW by causing penetration, however slight, of the vulva . . . by the penis; and

(2) That the accused did so by causing bodily harm to JW.

(3) That the accused did so without the consent of JW.[52]

Bodily harm "means any offensive touching of another, however slight, including any nonconsensual sexual act[.]"[53] In this case, the bodily harm alleged was the "offensive touching of J.W., however slight, including any nonconsensual act."[54] "When the same physical act is alleged as both the actus reus and the bodily harm for the charged sexual assault, the government must prove lack of consent as an element."[55] The government must prove beyond a reasonable doubt that JW did not consent to the physical act(s).[56] Consent is defined as:

> [A] freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.[57]
>
> Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or

---

[52] Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at 573-74 (10 Sep 2014).

[53] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (MCM), Part IV, ¶ 45.a(g)(3).

[54] Charge Sheet.

[55] Military Judges' Benchbook at 575.

[56] *Id.*

[57] MCM, Part IV, ¶ 45.a(g)(8)(A). *See also* Military Judges' Benchbook at 576.

whether a person did not resist or ceased to resist only because of another person's actions.[58]

### 3. *Mistake of fact*

Evidence of a misunderstanding of the circumstances surrounding an offense may give rise to the defense of mistake of fact. *See* RULE FOR COURTS-MARTIAL (R.C.M.) 916(j)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) (MCM) ("[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense."). In the context of sexual assault committed by bodily harm—where lack of consent is an element—mistake of fact can negate the element of consent.

If there is evidence or testimony "tending to show that, at the time of the alleged offense, the accused mistakenly believed that [the alleged victim] consented to the sexual conduct alleged[,]" then the defense of mistake of fact has been raised.[59] "An accused is not required to testify in order to establish a mistake-of-fact defense. The evidence to support a mistake-of-fact instruction can come from evidence presented by the defense, the prosecution or the court-martial." *United States v. DiPaola*, 67 M.J. 98, 100 (C.A.A.F. 2008) (citing *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998)). Nor does defense counsel's failure to raise mistake of fact result in forfeiture of the defense. *See United States v. Sellers*, 33 M.J. 364, 368 (C.M.A. 1991).

The evidence triggering the mistake of fact defense must show that the accused's mistake was both honest and reasonable. *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003). *See also* R.C.M. 916(j)(1) ("If the ignorance or mistake goes to any other element requiring only general intent [vice specific intent] or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances.").

> "Mistake of fact as to consent" means the accused held, as a result of ignorance or mistake, an incorrect belief that the other person consented to the sexual conduct as alleged. The ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. To be reasonable, the ignorance or mistake must have been based on information, or lack of it, that would indicate to a reasonable person that the other person

---

[58] MCM, Part IV, ¶ 45.a(g)(8)(C). *See also* Military Judges' Benchbook at 576.

[59] Military Judges' Benchbook at 581.

consented. (Additionally, the ignorance or mistake cannot be based on the negligent failure to discover the true facts. "Negligence" is the absence of due care. "Due care" is what a reasonably careful person would do under the same or similar circumstances.)

[The factfinder] should consider the inherent probability or improbability of the evidence presented on this matter. [The factfinder] should consider the accused's age, education, experience, along with the other evidence in this case . . . .[60]

Although the appellant bears the burden of raising some evidence of a mistake of fact, the burden remains on the government to prove, beyond a reasonable doubt, that there was neither consent nor an honest and reasonable mistake of fact as to consent.

The burden is on the prosecution to establish the guilt of the accused. If [the factfinder is] satisfied *beyond a reasonable doubt* that the accused was not under the mistaken belief that the other person consented to the alleged sexual conduct, then the defense of mistake does not exist. Even if [the factfinder] conclude[s] that the accused was under the mistaken belief that the other person consented to the sexual conduct as alleged, if [the factfinder is] convinced *beyond a reasonable doubt* that, at the time of the charged offense, the accused's mistake was unreasonable, the defense of mistake does not exist.[61]

But if the factfinder is *not* convinced beyond a reasonable doubt that the accused was *not* under an honest and reasonable mistake of fact as to consent, then the defense exists. The government must overcome the defense and satisfy its burden of proving the elements of the offense, including lack of consent, beyond a reasonable doubt.

---

[60] *Id. See also United States v. Paige*, 67 M.J. 442, 455 (C.A.A.F. 2009) (in the context of sexual assault, "the mistake of fact defense requires a subjective, as well as objective, belief that [the other person] consented to the sexual intercourse"); *Jones*, 49 M.J. at 91 ("'a mistake-of-fact defense to a charge of rape requires that a mistake as to consent be both honest *and* reasonable'") (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995)) (emphasis in original).

[61] *Id.* at 582 (emphasis added).

## B. The phone call, mistake of fact, and reasonable doubt

### 1. Admissions vs. confession

The government introduced the surreptitiously recorded phone call between the appellant and JW as a prosecution exhibit and argued it was a confession. Although the appellant made repeated admissions, we do not believe they amounted to a confession of sexual assault. A confession is "an acknowledgment of guilt." MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 304(a)(1)(B), MCM. An admission is "a self-incriminating statement falling short of an acknowledgment of guilt[.]" MIL. R. EVID. 304(a)(1)(C).

Although we were not able to observe witnesses testifying, we were able to listen to the recording of the phone call. Our first impression was the tenor of the conversation. JW and the appellant spoke to each other in a familiar tone indicative of a close personal relationship. The initial awkwardness in JW's voice disappeared quickly. She referred to his knowledge of her. He made comments indicating that her opinion of him mattered and that he was sensitive to her feelings. JW and the appellant had communicated electronically for six weeks before they met in person, and this conversation reflected the existence of a relationship. To be clear, we do not believe the existence of this relationship formed a basis for consent to sexual activity. Instead it is relevant to our interpretation of the phone call.

JW, who sat with a detective, employed three tactics to elicit admissions from the appellant. She confronted him with details of the night. Once he admitted that she said "no," she tried to leverage those admissions to extract more detailed admissions. This was almost entirely unsuccessful. She pleaded with him to tell her the truth. He responded repeatedly that he had told her the truth. Thirdly, she explained that she needed him to admit to what happened so she could get over it and move on. She also suggested that resolution of the issue would restore their friendship, trust between them, and some kind of relationship. The appellant was most responsive to these emotional pleas to tell her what she wanted to hear. She repeated these three tactics in something of a cycle as she attempted to elicit something more than an admission that she had said no. She argued that she said no, and he argued that the surrounding circumstances—her actions—communicated otherwise. As the conversation continually reached an impasse, their audible frustration with each other grew.

On two occasions, the appellant made statements acknowledging guilt. For multiple reasons, we believe they were offered to placate JW and not as genuine confessions. The first statement came midway through the conversation. The appellant ended it with what sounded like a less than

sincere apology and "what do you want me to say?"[62] JW responded with emotion and gratitude, telling him that was what she wanted to hear. But either JW or the detective was not satisfied, and JW again attempted to extract more from the appellant. The cycle of confrontation and denial restarted. Despite his admissions and even words amounting to a confession, the appellant consistently denied raping her, holding her down, or going too far. The appellant expressed his weariness and desire to end the discussion. She justified her persistence by saying, "you keep going back on your word."[63] What followed sounded like the appellant's attempt to end a stalemate—appeasement—not a sincere, remorseful acknowledgment of guilt. Once again, the appellant conditioned his words, saying, "[i]f that's how you . . . [.]"[64] JW interrupted him before he could finish and then quickly ended the phone call.

### 2. *Honest mistake of fact*

The phone call raised the defense of mistake of fact. Trial defense counsel chose not to pursue a mistake of fact defense but instead challenged JW's credibility. Since a military judge—not members—tried the appellant, instructions as to a mistake of fact defense were never at issue. There is no proffer of some evidence of mistake of fact to evaluate. Instead, we consider a mistake of fact defense in our *de novo* review of the legal and factual sufficiency of the appellant's conviction for sexual assault.

The conversation provided ample evidence that the appellant honestly believed his sexual encounter with JW was consensual. As sexual assault is a general intent offense, we must determine whether we are convinced beyond a reasonable doubt that the appellant did *not* act under a reasonable, as well as honest, mistake of fact when he had sexual intercourse with JW.

### 3. *The surrounding circumstances*

We cannot ignore the context surrounding the incident and the mistake of fact at issue. According to JW, the appellant apparently misunderstood her feelings about his presence in her apartment, even before his first visit. This misunderstanding continued for four days. A mistaken belief as to whether someone is welcome in another person's home and company is both factually and legally distinguishable from a mistake of fact as to consent to sexual activity. But it would be artificial to divorce a two-hour mistake of fact about sexual activity from the surrounding week-long misunderstanding. Whether

---

[62] PE 6 at 14:20.

[63] *Id.* at 25:00.

[64] *Id.* at 25:30.

the appellant reasonably misconstrued JW's thoughts and preferences about his presence in her home and their continued interaction is probative of his mistake as to her consent to sexual activity.

JW testified she did not want the appellant to come to her apartment the night of Monday, 31 August. She gave him her address only to silence his persistent requests. Early in their recorded call, she asked him why he insisted on coming to her apartment on a Monday night when she was so sick. His reply was almost indignant. "Because you wanted me to."[65] Persistence is the only reason JW offered as to why she gave the appellant her address when she did not want him to visit.

JW, who testified to feeling very unwell, invited the appellant to watch Netflix in her bedroom into the early morning hours. She believed that the appellant would leave her apartment at the end of the show, and she would go to sleep alone. After admitting the appellant to her bedroom and shutting the door behind them, she went to the bathroom, removed her bra, and changed into her pajamas. She returned to the bedroom and turned out the light. In order to see the laptop screen on her lap, JW and the appellant must have lain side by side on her bed. To be absolutely clear, none of this implies, much less amounts to, consent to any sexual activity, let alone sexual intercourse. But these circumstances are relevant to our consideration of the reasonableness of the appellant's mistake of fact.

Following the alleged sexual assault, JW changed her clothes, returned to her bed, and slept with the appellant until her alarm awakened her around 7:30 that morning. She testified that, immediately after the alleged assault, she could not confront the appellant "without some sort of repercussion from him."[66] But before leaving for school that morning, she "expressed to him how [she] was angry[.]"[67] When he responded by assuring her she was not a slut, she clarified that she had not wanted to have sex with him.

JW went to school for the day, and the appellant presumably went to work. But they proceeded with their plans to meet up that afternoon. JW asked the appellant to pick up take-out food for her on his way to her apartment. She drove him from her apartment to the gym and then drove him back to her apartment where he spent a second night. He returned Wednesday afternoon but did not stay the night. JW and the appellant talked about their plans to go out during the coming Labor Day weekend. JW's

---

[65] PE 6 at 5:30.

[66] Record at 70.

[67] *Id.*

roommate testified to observing this conversation and JW's ambivalence and lack of enthusiasm about their plans. But it was the appellant who cancelled the plans the next day, citing the arrival of a female friend for a visit that weekend. JW and her roommate testified that JW responded to this cancellation with glee, but had the appellant not cancelled, the evidence suggests JW would have gone out with him again.

We focus on what passed between the appellant and JW before and after intercourse solely for the misunderstanding that developed and persisted between them. According to JW's testimony, the appellant's very presence in her apartment was always unwanted, with the possible exception of an hour watching Netflix. Yet the appellant came to her apartment three times, spent the night twice, maintained communications with her via text, and planned a weekend outing with her, apparently oblivious to her true feelings. During the phone call, he argued that her behavior was incongruent with her allegation. Instead of detecting fear, antipathy, or even apathy in JW, he asserted his belief the relationship was progressing. The appellant contended everything was fine between them until he had to cancel their weekend plans. Outside of JW's testimony, there is little evidence that the appellant's misunderstanding was unreasonable.

In this context of misunderstanding, we look at the sexual act and the mistake of fact as to consent to sex.

*4. The government's case*

The prosecution's evidence consisted almost entirely of JW's testimony. Alcohol played no role in this case. JW did not allege in the phone call or at trial that she was asleep or unconscious before or during the sexual act. The forensic evidence in the case consisted of a photograph, taken four to five days after the incident, of what appeared to be a bruise on JW's neck. JW attributed it to the appellant sucking on and biting her neck. Aside from her testimony, there was no evidence of injury or use of physical force. JW washed her sheets and clothing after the incident and then threw away her clothing. The government did not present the underwear the appellant allegedly removed. JW did not report the sexual assault for almost two weeks, and there was no evidence of a sexual assault forensic exam. Other than the surreptitiously recorded phone call, there were no text messages or other communications between JW and the appellant in evidence. JW's roommate was in the apartment, in her own bedroom, during the entire incident. But she did not report hearing or seeing anything unusual. JW confided in a girlfriend and her roommate about the incident but waited a week to report a sexual assault. Her roommate and friend testified to her distress but not about the content of their conversations. No law enforcement interviews were admitted into evidence.

Although we owe the military judge's verdict no deference, we acknowledge that he saw and heard JW and other witnesses testify. *See Washington*, 57 M.J. at 399. We did not. Nevertheless, we surmise the military judge found JW credible, and our own assessment of the record reveals no evidence that JW lied to investigators or the court.

Nor do we believe JW lied about or attempted to withhold information from her medical records, as trial defense counsel suggested. JW's sore throat and feelings of illness at the time of the incident are relevant not to her credibility but to the appellant's mistake of fact. JW emphasized the weakness she felt during the appellant's visit. Her testimony indicated that she believed her weakness was relevant to her interaction with the appellant and that he should have recognized it. It is unclear how the appellant would have—or should have—known that a bloody nose, sore throat, over-the-counter pain relievers, or an antibiotic would have left JW weakened.

To the extent we have concerns about JW's credibility, they stem from the record. During the phone call, JW told the appellant she said "no like 20 or 30 times."[68] By the time of trial, she testified that she said no "30 to 40 times."[69] More important, trial defense counsel effectively impeached JW with statements about the incident she sent to her ex-boyfriend via text message. Her ex-boyfriend testified that she wrote "she woke up to [the appellant] kissing her and touching her."[70] This is contrary to her testimony that she was awake preceding the incident. According to the ex-boyfriend, JW also claimed to have confronted the appellant on the morning of the incident, saying "something along the lines of, 'You raped me and I'm pressing charges[.]'"[71] JW denied such a statement.

JW's testimony, on direct and cross-examination, presented legally sufficient evidence of sexual assault. But the recorded phone call both corroborated and disputed JW's narrative. The argument between JW and the appellant not only raised the mistake of fact defense but also dramatized the tension at the crux of our factual sufficiency review. JW tenaciously held to her position that her utterances of "no" communicated her lack of consent to sex. "An expression of lack of consent through words or conduct means there is no consent."[72] The appellant countered that JW's non-verbal behavior

---

[68] PE 6 at 5:00.

[69] Record at 68.

[70] *Id.* at 190.

[71] *Id.*

[72] MCM, Part IV, ¶ 45.a(g)(8)(A). *See also* Military Judges' Benchbook at 576.

undermined her words and communicated her consent. "All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions."[73]

In this case, the surrounding circumstances unfolded over a two-hour period. To determine, *beyond a reasonable doubt*, whether the appellant's mistake of fact as to JW's consent was not reasonable, we must inquire further into those circumstances immediately preceding the sexual act.

### 5. *The two-hour gap*

The events at issue unfolded over more than two hours. Both JW and the appellant were sober, and both were awake. But prosecutors presented evidence about only a fraction of those two hours. There were two kisses a few minutes apart sometime between midnight and 12:30 a.m. Then at 2:36 a.m., the appellant rolled on top of JW a third time. Intercourse occurred within minutes.

Counsel elicited only vague testimony from JW about the interim period. She testified that she lay on her back staring at the ceiling, engaging in minimal conversation with the appellant. On cross-examination she indicated that he attempted to kiss her multiple times, but she denied there was other romantic activity. Based upon the record before us, we are skeptical that the appellant and JW lay still in near silence for two hours, especially in light of the stop-and-go, back-and-forth sexual activity to which the appellant repeatedly alluded in the phone call. He recounted kissing and touching, frequently stopping and then resuming, sometimes at his initiative and sometimes at hers. In his admissions, the appellant acknowledged her hesitation, which led him to stop. He explained why he continued despite the word no. "Because you would provoke me[.]"[74] Although expressed inarticulately, his impression of her subsequent invitation was clear. During the phone call, JW denied none of the appellant's assertions. She questioned only his claim that she put her finger between his lips. This was among the most credible of the appellant's comments because of its spontaneity and oddity. The prosecution did not prompt JW to rebut the appellant's claims or elaborate further on her cursory denial of other romantic activity.

These circumstances preceding the act in this case may be highly probative of both consent and the reasonableness of the appellant's mistake of fact. But we are left to speculate about them. Without more information,

---

[73] MCM, Part IV, ¶ 45.a(g)(8)(C). *See also* Military Judges' Benchbook at 576.

[74] *Id.* at 16:00.

we find that we cannot determine, beyond a reasonable doubt, that the appellant's mistake of fact as to JW's consent to sexual activity was unreasonable.

### 6. *The government's burden*

Once a mistake of fact is raised, the government must disprove it beyond a reasonable doubt in order to satisfy its burden of proving lack of consent beyond a reasonable doubt. We are not convinced beyond a reasonable doubt that the appellant was not under the mistaken belief that JW consented. As to whether that mistake was unreasonable, we have questions that leave us with reasonable doubt.

Factual sufficiency demands that we be able to exclude "every fair and rational hypothesis except that of guilt." *Loving*, 41 M.J. at 281. Honest, conscientious doubt suggested by a lack of material evidence prevents that in this case. *Id.* The government has fallen short of its burden, and we are not convinced beyond a reasonable doubt that, at the time of the charged offense, the accused's mistake was unreasonable.[75] Thus we find the conviction for sexual assault factually insufficient.

The appellant's second assignment of error as to ineffective assistance of counsel is moot.

### III. CONCLUSION

The findings of guilty and the sentence are set aside, and the charge and specification are dismissed.

Judge JONES concurs.

WOODARD, Judge dissenting:

I must respectfully disagree with my colleagues. After weighing all of the evidence in the record of trial and making allowances for not having personally observed the witnesses, I, like the military judge in this case, am convinced of the appellant's guilt beyond a reasonable doubt. Additionally, as I find that the appellant's trial defense counsel were not ineffective, I would affirm the findings and sentence.

In order for the appellant to claim a mistake of fact as to consent as a defense, his mistake must have existed in his mind at the time he engaged in sexual intercourse with the victim. More importantly, his mistake must have been not only honest but also reasonable. I find that any mistake of fact as to

---

[75] Military Judges' Benchbook at 582.

the victim's consent raised by the evidence in this case was proven, beyond a reasonable doubt, to be unreasonable.

Prior to 31 August 2015, the appellant and the victim had only communicated with each other via social media, Facetime, phone calls, and text messages.[1] There is no evidence in the record that any of these communications were ever sexual in nature. The first time they ever physically interacted with each other was the night of 31 August 2015.[2] After arriving at the victim's apartment around 9:30 p.m., for approximately two hours they remained in the living room where the victim studied and the appellant attempted to assemble a desk chair.[3] Nothing in the record suggests that any conversation or actions between them that occurred during this two-hour period was of a sexual nature.

Sometime around midnight, the victim and the appellant began watching a television episode on her computer while lying on her bed. Prior to watching the television episode, the victim changed, in a bathroom out of the sight of the appellant, into her normal sleeping attire—a big tee-shirt, shorts, and underwear.[4] Although the victim did not claim to have ever laid any ground rules about not having sexual intercourse or engaging in other sexual acts that night, this question was never posed to her by the government, defense, or the court.

During the first 30 minutes of the episode, the appellant made his first two attempts at sexual conduct with the appellant. Twice the appellant attempted to initiate sexual conduct by rolling over onto the victim and kissing her.[5] The victim verbally expressed her non-consent to the sexual conduct by telling the appellant "No. Stop. I don't want this to happen. This is not happening tonight."[6] She also physically expressed her non-consent by

---

[1] Record at 58-59.

[2] *Id.* at 60-61.

[3] *Id.* at 61.

[4] *Id.* at 90. Based upon my review of the record, it is unclear whether the victim was actually wearing a bra at this time. The only mention of a bra in the record is made when the trial defense counsel asks the victim, "[a]nd you were not wearing a bra?" to which the victim responded, "no." *Id.* at 99. Without the benefit of hearing the inflection of the victim's voice as she made this statement, and with no further explaination in the record, the victim's negative answer could be interpreted to mean either "no, I was not wearing a bra" or "no, I was wearing a bra."

[5] *Id.* at 63-64

[6] *Id.*

pushing the appellant off of her.[7] Apparently the appellant heard, understood, and complied with the victim's objections to both of these first two instances because each time he rolled back off of her and ceased his attempt at foreplay.[8]

The evidence of what happened between them, or lack thereof, over the following two hours—12:30 a.m. to 2:36 a.m.—is, as the majority points out, probative on the issues of consent and mistake of fact. However, where my colleagues find reasonable doubt due to what they perceive as a critical two-hour gap in the evidence, my review of the record reveals no such gap.

The record reveals that there are two opposing versions of what occurred during this time period. First we have the account the victim presented in court, subject to the crucible of cross-examination. The victim testified that following the appellant's second attempt at engaging her in sexual conduct, she lay in the bed next to him "staring at the ceiling" and described that she and the appellant were "fairly silent with little conversation."[9] On cross-examination the victim reconfirmed that there was minimal talking, that she was staring at the ceiling, and that other than the appellant's continued attempts to kiss her, there was no other "romantic activity going on" between them.[10] In contrast, we have the appellant's version of what happened during that time as gleaned from the 26-minute recorded conversation. In the recording, the appellant mentions that the victim kissed, touched, and felt on him, and he did the same to her.[11]

If the victim's sworn testimony is credible and to be believed, nothing but small talk and some additional, less aggressive attempts by the appellant to kiss her occurred. If the appellant's recorded, vague assertions are credible and to be believed, the two engaged in some mutual touching and fondling. Although the evidence of what happened during this time period may be in conflict, it is, nonetheless, evidence of what did or did not occurr. "Reasonable doubt . . . does not mean the evidence must be free from conflict." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) ), *aff'd on other grounds,* 64 M.J. 348 (C.A.A.F. 2007) (citation omitted). By believing that they are left to speculate about the interactions between the victim and the appellant during this time period, the majority misconstrues the evidence

---

[7] *Id.*

[8] *Id.* at 63-64.

[9] *Id.* at 65.

[10] *Id.* at 100-01.

[11] PE 6 at 7:20, 7:41, 8:01, and 9:53.

actually contained within the record. It is either as the victim described in her sworn testimony or it is as the appellant claimed in the recorded conversation.

Although what happened between the appellant and the victim before 2:36 a.m. is probative on the issues of consent and the reasonableness of any mistake of fact as to that consent—what happened after 2:36 a.m. is even more so. The victim's description of what occurred is disturbing and graphic.

The victim testified that the appellant, just as he had done twice before, initiated his final assault by rolling "back over on top of [her] at 2:36 in the morning and he started dry humping [her]."[12] She described the appellant's facial expression as, "the look in his face was just completely different than the first two times."[13] She went on to explain how "[she] kept telling him no and stop and [she] wasn't comfortable with this and [she] didn't want this to happen" but the appellant just "ignored [her]."[14] She further testified how she resisted the appellant's efforts by pushing him away with her hands, but he then forcefully held her hands above her head, kissed and bit her neck, and attempted to remove her shorts and underwear. Although the appellant was able to remove her shorts and throw them on the floor, she managed to grab her underwear and pull them back up. However, despite her efforts, the appellant was later successful in removing her underwear. When asked why she resisted the appellant's efforts to remove her underwear, she responded— "[b]ecause I didn't want him to rape me."[15]

The victim then described how, after the appellant had successfully removed her underwear, "[h]e tried to stick himself inside [her]," and how "he tried to finger [her]" but that she was able to thwart his attempts by "push[ing] his hands away."[16] The victim also testified that during this time the appellant told her that he wanted to perform oral sex on her and that he wanted her to perform oral sex on him, to which the she responded "either [sic] one wasn't going to happen."[17] She explained how, throughout this final assault, she told the appellant, in a variety of ways, "no—30 to 40 times,"[18]

---

[12] Record at 65.

[13] *Id.* The victim later described this look as "an angry face like he was going to get what he wanted to and there wasn't any stopping him no matter what." *Id.* at 68-69.

[14] *Id.* at 65.

[15] *Id.* at 67.

[16] *Id.*

[17] *Id.*

and that as the appellant "forcefully . . . pushed open her legs and penetrated her,"[19] she was trying to push him off of her with her hands and legs.

After unsuccessful preventing the appellant to penetrate her by telling him "no" and "stop" multiple times, by pushing him away with her arms and legs, and by pushing his hands away from her genitalia, the victim explained that at that point she "didn't have the strength to do it anymore," she "just gave up," and "went into survival mode which was just to lay limp and let him take what he wanted."[20] The victim later clarified on cross-examination that she just "froze"—no yelling, screaming, or further resistance, and that she just "wanted to get through it."[21]

Noting that the defense never pursued or argued mistake of fact as to consent during the trial, and the appellant did not testify, if the evidence of the sexual assault in this court-martial ended here, we would have "no insight as to whether appellant actually or subjectively did infer consent based on these circumstances" of the evening leading up to the sexual intercourse. *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995). Accordingly, if there is evidence of mistake of fact as to consent to be found in the record—it must be found in the recorded 26-minute conversation.

In evaluating the content of the recorded conversation, it is important to recognize the context and circumstances under which the recording was made and the purpose of the conversation. Although the appellant may not have realized it at the time, in reality, this was not an instance of a private conversation between two individuals trying to work out their differences. Nor was it a sworn deposition. Instead, it was a conversation initiated as part of a criminal investigation with the victim being guided by a civilian law enforcement agent. As revealed by the oft-repeated questions of the victim, the purpose of the conversation was to confront the appellant with the victim's allegation and her account of what happened; have him confirm as much of that account as possible; and attempt to obtain an apology.

I agree with my colleagues that the appellant made several statements that provides some evidence upon which we can rely to find that he actually or subjectively did infer the victim consented to the sexual intercourse. As such, I agree that the defense of mistake of fact as to consent was raised by the evidence presented in the recorded conversation and the government was

---

[18] *Id.* at 68.

[19] *Id.* at 69.

[20] *Id.* at 68.

[21] *Id.* at 129.

required to prove beyond a reasonable doubt that his mistake was unreasonable. However, unlike the majority, I find the government has met its burden.

Although the appellant's assertions in these statements reveals for us the circumstances of why he may have honestly believed that the victim consented to sexual intercourse, the law requires more. No matter how honestly held the appellant's belief may have been, his belief must still have been reasonable. The reasonableness of his belief must be considered in light of all of the circumstances—not just the potentially self-serving assertions pointed out by my colleagues, or the circumstances of the assault as described by the victim testimony—but also the statements made by the appellant during the recorded conversation which were against his interest. The statements he made against his interest fall into three basic categories: (1) acknowledgments that the victim had verbally expressed her non-consent; (2) confirmation of some of the details of the night as described by the victim in her sworn testimony; and (3) the admissions and apologies of the appellant.

First, over the course of the 26-minute conversation, after initially stating that he "barely"[22] remembered her telling him no, the appellant later unequivocally acknowledged at least 17 times during the conversation that the victim had objected—at least verbally—to his sexual advances that night prior to him engaging in sexual intercourse with her. Some of these objections were so forceful, the appellant described them as "you were almost like get the hell out of my apartment."[23]

Second, in addition to acknowledging that the victim had verbally expressed her lack of consent to his sexual advances, the appellant also confirmed other details of the night as described by the victim during her sworn testimony. For instance, the victim told him to stop biting—or, as described in the conversation, sucking—on her neck because it hurt and was going to leave a mark.[24] The sexual advances had come in waves[25]—"[I] wanna say two or three times we stopped where we didn't do anything."[26]

---

[22] PE 6 at 4:45.

[23] *Id.* at 9:43.

[24] Record at 68; PE 6 at 6:31 and 7:10.

[25] Record at 63-69.

[26] PE 6 at 7:15

Sexual intercourse had, in fact, occurred.[27] And finally, after the appellant penetrated the victim, she stopped resisting.[28]

Finally, the appellant admitted not once, but at least three times during the conversation that having sexual intercourse with the victim that night was not okay with her and followed each of these admissions with apologies. The first instance occurred after the appellant admitted that the victim had said no to his advances:

> JW: So if I said no, how did you think that I wanted to have sex?
>
> APP: It wasn't OK with you and you said no.
>
> JW: What did you say? I'm sorry, I can't hear you?
>
> APP: It wasn't OK with you. And yes, you did say no.
>
> JW: What wasn't OK with me?
>
> APP: Having sex with you wasn't OK and you did say no. Sorry, [JW], like what do you want me to say.
>
> JW: Thank you. That's what—that's that's really what I wanted to hear.[29]

After this first admission and apology, the appellant went on to confront the victim with how she never "forcefully" said no, and how she "almost said it as if [she] wanted [him] to keep going but [she wasn't] sure if [she] wanted to do it."[30] The appellant's next acknowledgment and apology occurred shortly after this explanation of why he continued despite her verbal protest:

> JW: Well, I mean, you just had admitted to me that I said no and you continued to do that. So I don't understand why you think that I had to choke you or something because I did push you off. Don't you remember that? I mean you just jumped back upon me. Why is that OK?
>
> APP: I didn't say it was OK.
>
> JW: So are you sorry?

---

[27] Record at 69; PE 6 at 7:10, 7:34, 8:17, 8:48, 14:31, and 21:43.

[28] Record at 68 and 129; PE 6 at 8:48 (The appellant stated, "[w]hen we were actually having sex, you never said no.").

[29] PE 6 at 14:14.

[30] *Id.* at 15:50.

APP: [JW], at this point I'm over it. I'm sorry that came between our friendship like that. That it cuts between whatever we had. So for like a perfectly clean cut, cut us away from each other. It is what it is. I'm sorry about that. Sorry that I did whatever I did to make you feel so offended or make you feel like I'm a bad guy or make you feel like sex was the only thing I wanted from you. Or sex is the only thing I intended from you. Or sex is the—like I'm sorry that you feel, I pulled myself onto you like I almost raped you. I'm sorry that you feel any type of way. That wasn't how I wanted you to feel. I'm sorry.[31]

The appellant's final acknowledgment and apology came at the end of the conversation after the two had discussed whether the appellant had forced himself on her:

JW: OK, looking back, I mean do you think you just went too far?

APP: No, [JW], why are you asking these questions?

JW: I have told you over and over. I just want the truth RJ. That's it. I don't know why you can't just admit this to me?

APP: I just told you the truth and you keep asking me different questions. Why do you keep asking me different questions?

JW: Because you're not telling me the truth because you keep going back on your word. I just want to know that I can trust you.

APP: [JW], you're never going to trust me again.

JW: You don't know that.

APP: I do.

JW: I Just want to know that this isn't going to happen to somebody else or this won't happen to me again. That's all. I just, that's all I want to know.

APP: [JW], yes you said no. Yes, I forced myself on you cause that's how you . . [32]

JW: Thank you. Thank you. That's all I needed to hear.

---

[31] *Id.* at 16:35.

[32] The appellant's voice trails off and he never finishes this statement.

APP: I, I'm sorry.

JW: Going forward I just need to take some time and I'll, I'll be in touch with you. But I appreciate you telling me the truth RJ. I really do. This is going to help a lot for me to move on and clarify . . .

APP: [JW].

JW: . . . things. I'm on campus right now. I need to go. There is somebody walking by and I'm about to bust out in tears so I really need to go.

APP: [JW].

JW: Sorry.

APP: [JW]. [The phone line goes dead.][33]

One could argue that these statements were confessions and not just admissions and apologies. As such, they would belie any claim that the appellant's mistake of fact was honest. However, viewing them in the light most favorable to the appellant as admissions, these statements still weigh heavily against the reasonableness of his belief. At least 17 times during the short 26-minute conversation the appellant admitted that he heard the victim voice her objection to his sexual advances. He even acknowledged that some of those objections were made in a forceful manner. He admitted numerous times that having sexual intercourse was not okay with her and apologized. Notably, the unreasonableness of his belief may be best demonstrated by what the appellant did not say in the conversation. The appellant never said or implied that the victim verbalized her consent to his sexual advances. Instead, he argued with her that if he was sexually assaulting her that night she would have done more to prevent him from doing so.[34]

The majority divines from the tone and tenor of his voice in the recording that the appellant is placating the victim, offering disingenuous admissions that she said no and that he forced himself on her, and giving hollow apologies—because that is what she wants to hear. Listening to the same recorded conversation I hear something quite different. I hear an appellant who quickly evolved over the short 26-minute conversation from one who may have been initially adamant in his belief that he had done nothing wrong and may have believed his sexual experience with the victim was one of mutual

---

[33] PE 6 at 24:30.

[34] *Id.* at 15:50.

consent, to one one who—after repeatedly acknowledging the victim had objected to his sexual advances and recognizing the unreasonableness of his own belief regarding the victim's consent—sounded contrite and remorseful because he had ignored, missed, or misinterpreted her words and actions that night and had forced himself on her.

What implication we assign to the tone and tenor of the appellant's voice in the recording, and our view of the sincerity or emptiness of his admissions and apologies can be debated. However, the record is clear on this—the victim did not consent to sexual intercourse with the appellant. There was no freely given agreement to the conduct at issue. The victim repeatedly expressed her lack of consent through her words and resistive conduct. The appellant chose to ignore these repeated verbal and unrebutted physical expressions of non-consent. He was singularly focused on engaging in sexual intercourse regardless of the numerous stop signs put up by the victim.

Even assuming *arguendo*, the appellant was under the honestly mistaken belief the victim was consenting to the sexual intercourse because of any mixed signals he may have received from the victim, to be reasonable his mistake must have been based upon information, or lack of it, that would indicate to a reasonable person that the victim consented. Not that she may have consented, but that she did consent to sexual intercourse. Considering the victim's continuous verbal and physical protests to the appellant's sexual advances, his belief that she consented to sexual intercourse was, beyond a reasonable doubt, unreasonable. The appellant's mistake was based upon his negligent failure to exercise due care to discover whether or not the victim was, in fact, consenting to sexual intercourse. Under the circumstances the appellant found himself in those early morning hours, I have no doubt that a reasonably careful person would have stopped sexually pursuing the victim until after they had obtained a clear understanding of and affirmation of the victim's consent to sexual intercourse before penetrating her.

For these reasons I would affirm the appellant's sexual assault conviction.

For the Court

R.H. TROIDL
Clerk of Court